**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

RAY HRDLICKA, an individual;
CRIME, JUSTICE & AMERICA, INC., a
California corporation,
                    *Plaintiffs-Appellants,*

                    v.

PERRY L. RENIFF, in his official
capacity of Sheriff of the County
of Butte, California,
                    *Defendant-Appellee.*

No. 09-15768

D.C. No.
2:08-cv-00343-
GEB-EFB

Appeal from the United States District Court
for the Eastern District of California
Garland E. Burrell, United States District Judge, Presiding

RAY HRDLICKA, an individual;
CRIME, JUSTICE & AMERICA, INC., a
California corporation,
                    *Plaintiffs-Appellants,*

                    v.

JOHN MCGINNESS, Sacramento
County Sheriff,
                    *Defendant-Appellee.*

No. 09-16956

D.C. No.
2:08-cv-00394-
FCD-EFB

OPINION

Appeal from the United States District Court
for the Eastern District of California
Frank C. Damrell, Senior United States
District Judge, Presiding

Argued and Submitted
May 13, 2010—San Francisco, California

1812                          HRDLICKA v. RENIFF

Filed January 31, 2011

Before: Stephen Reinhardt, William A. Fletcher and
N. Randy Smith, Circuit Judges.

Opinion by Judge William A. Fletcher;
Dissent by Judge N.R. Smith

1816                     HRDLICKA v. RENIFF

## COUNSEL

Andrew Alexander Dosa, Alameda, California, Spencer D. Freeman, Tacoma, Washington, for the appellants.

Bradley Justin Stephens, OFFICE OF THE COUNTY COUNSEL, Oroville, California, for appellee Perry Reniff.

Amanda Lynn Butts, Jeri Lynn Pappone, LONGYEAR O'DEA AND LAVRA, Sacramento, California, for appellee John McGinness.

Paul R. Coble, Martin J. Mayer, JONES & MAYER, Fullerton, California, for Amicus Curiae.

---

## OPINION

W. FLETCHER, Circuit Judge:

Plaintiffs, Ray Hrdlicka and his publication Crime, Justice & America ("CJA"), brought two suits claiming that their First Amendment rights are being violated by the mail policies at two county jails in California that refuse to distribute unsolicited copies of CJA to inmates. The district courts in each case granted summary judgment to defendants after applying the four-factor test of *Turner v. Safley*, 482 U.S. 78 (1987).

In these related appeals, we conclude that questions of material fact preclude summary judgment to defendants. On this record, we cannot hold as a matter of law under *Turner* that defendants have sufficiently justified their refusal to distribute unsolicited copies of CJA to jail inmates. We therefore reverse and remand to the respective district courts.

### I.   Background

Ray Hrdlicka, a former bail bondsman, began publishing CJA in 2002. CJA addresses criminal justice topics relevant

to jail inmates. One recent issue of the publication included, for example, a section describing the steps between a felony arrest and conviction, an article on firearms enhancements to sentences, and a page of humor. Approximately three-fourths of each publication contains such content. The remainder contains advertisements for bail bond agents and lawyers. CJA attracts advertisers by promising to get their message in front of thousands of jail inmates who are in immediate need of their services. Since 2002, CJA has published 14 editions and over 1 million copies. CJA is currently distributed in jails in more than 60 counties in 13 states, including 32 county jails in California.

The Principal Librarian for the California Department of Corrections has recommended CJA as an acceptable donation to the California Department of Corrections Law Libraries. Fortune Small Business described CJA as a "surprisingly professional-looking 40-page upstart quarterly with articles written by lawyers and other criminal-justice-system professionals and spotlighting issues most glossies prefer to avoid." The record contains over 100 letters of appreciation from inmates who have found the publication valuable.

CJA does not rely on subscriptions or requests for distribution. Instead, CJA delivers unsolicited magazines to inmates through one of two methods. If a jail agrees to accept general distribution, CJA delivers weekly supplies of magazines that jail staff then leave in common areas of the jail. If a jail declines to accept general distribution, CJA mails individually addressed issues directly to some inmates after obtaining inmate roster information. Under either method, CJA is typically delivered weekly at a ratio of about one copy for every ten inmates.

## A.   Hrdlicka v. McGinness

In September 2003, Plaintiffs contacted the Sacramento County Sheriff's Office to inquire about distributing CJA to

inmates in the jail in Sacramento County, California. Captain Scott Jones initially responded that individually addressed copies of CJA could be delivered to jail inmates, but that the jail would not facilitate general distribution. Plaintiffs made several requests for electronic copies of the inmate roster. These requests were denied, but Captain Jones informed Plaintiffs that a daily list of inmates was available in the jail lobby. Using that list, in December 2004 CJA began mailing individually addressed unsolicited copies to inmates at a ratio of one copy for every ten inmates.

In May 2005, Captain Jones informed Plaintiffs that the jail would no longer permit delivery of unsolicited copies of CJA. Captain Jones cited the jail's Operations Order, which prohibits the distribution of unsolicited publications regardless of content or postage rate. According to Captain Jones, the jail has never refused to deliver CJA to an inmate who requested it. The jail has a separate policy limiting the personal property an inmate can keep in his cell to the amount that can be held in two copy-paper boxes. An inmate may keep up to one newspaper, five periodicals, and five soft-covered books in his cell at any given time.

On February 5, 2008, Plaintiffs filed a § 1983 suit for injunctive relief against Sacramento County Sheriff John McGinness, alleging that the jail's refusal to distribute unsolicited copies of CJA violates the First Amendment. The district court granted summary judgment to Sheriff McGinness under *Turner*.

Plaintiffs timely appealed.

## B. *Hrdlicka v. Reniff*

In August 2004, Plaintiffs contacted the Butte County Sheriff's Department to inquire about distributing CJA to inmates in the jail in Butte County, California. Plaintiffs proposed a general distribution of CJA. Alternatively, they requested a

list of inmates so that Plaintiffs could mail individually
addressed issues of CJA. Plaintiffs proposed weekly distribu-
tion of one issue for every ten inmates. Sheriff's Department
officials informed Plaintiffs that the jail would not allow
delivery of unsolicited copies of CJA to inmates through
either method. They explained that the jail's mail policy pro-
hibits distribution of unsolicited commercial mail through
either general or individually addressed delivery.

The Butte County jail's mail policy is contained in a
Departmental Order. That order was issued on September 23,
2004, one month after CJA contacted the Sheriff's Depart-
ment. The order prohibits the distribution of all unsolicited
commercial mail to inmates, regardless of content or postage
rate. The Butte County jail has policies limiting the amount
of written materials inmates can keep in their cells and pro-
hibiting inmates from leaving items in common areas.

On February 5, 2008, Plaintiffs filed a § 1983 suit for
injunctive relief against Butte County Sheriff Perry Reniff,
alleging that the jail's refusal to distribute unsolicited copies
of CJA violates the First Amendment. The court granted sum-
mary judgment to Sheriff Reniff under *Turner*.

Plaintiffs timely appealed.

## II.   Standard of Review

We review *de novo* a district court's order granting sum-
mary judgment. *Bamonte v. City of Mesa*, 598 F.3d 1217,
1220 (9th Cir. 2010). Viewing the evidence in the light most
favorable to CJA and Hrdlicka, we must determine whether
there are any genuine issues of material fact and whether the
district courts correctly applied the relevant substantive law.
*See id.*

1820                    Hrdlicka v. Reniff

### III.   Discussion

#### A.   First Amendment

**[1]** Defendants argue categorically that the First Amendment does not protect distribution of a publication to inmates who have not requested it. The proper analysis, however, is more nuanced. In examining regulations that restrict communications with inmates, we first determine whether any First Amendment interest is implicated. If such an interest is implicated, we apply the four-factor *Turner* test to decide whether that interest gives rise to a protected First Amendment right.

**[2]** The Supreme Court applied this two-step analysis in *Thornburg v. Abbott*, 490 U.S. 401, 408 (1989). The Court began by stating that "there is no question that publishers who wish to communicate with those who, through subscription, willingly seek their point of view have a legitimate First Amendment interest in access to prisoners." *Id.* at 408. Having found such a "First Amendment interest," the Court then turned to the question of whether the publishers had an actual First Amendment right to send, and the inmates to receive, the particular communications at issue. Applying *Turner*, the Court held that regulations prohibiting certain communications were valid despite the unquestioned First Amendment interest. *Id.* at 419. Similarly, in *Pell v. Procunier*, 417 U.S. 817 (1974), the Court wrote that "restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system." *Id.* at 822. The Court noted that inmates might have a "constitutional interest" in the particular form of communication they sought, but ultimately held in that case that the interest did not give rise to a protected First Amendment right because of the strong countervailing interests of prison administration. *Id.* at 823-24, 827-28.

**[3]** In this case, we first decide whether a publisher has a First Amendment interest in distributing, and inmates have a

First Amendment interest in receiving, unsolicited publications. We have repeatedly recognized that publishers and inmates have a First Amendment interest in communicating with each other. *See, e.g.*, *Prison Legal News v. Lehman*, 397 F.3d 692, 699 (9th Cir. 2005) ("*PLN II*"); *see also Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989). A First Amendment interest in distributing and receiving information does not depend on a recipient's prior request for that information. *See Klein v. City of San Clemente*, 584 F.3d 1196, 1204-05 (9th Cir. 2009) ("The mere fact that an unwilling recipient must take the unsolicited leaflet from her windshield and place it in the garbage cannot justify an across-the-board restriction."); *see also Martin v. City of Struthers*, 319 U.S. 141, 143, 148-49 (1943) (striking down as unconstitutional a municipal ordinance that made it unlawful to go door to door distributing handbills, circulars, or advertisements). We see no reason why this well-established principle does not apply to a publisher's interest in distributing, and an inmate's corresponding interest in receiving, unsolicited literature.

**[4]** Because a publisher cannot deliver unsolicited communications to an inmate by distributing handbills on the street, or by leaving unsolicited leaflets on cars, the publisher needs some form of cooperation from jail or prison authorities in order to distribute its literature. (Indeed, some cooperation is needed for solicited communications as well.) However, jail or prison authorities cannot be required to distribute unsolicited communications irrespective of the burdens such distribution might place upon them. Whether the First Amendment interest in unsolicited communication with inmates gives rise to a First Amendment right thus implicates very different concerns from such communication in public fora. The Supreme Court's opinion in *Turner* addresses precisely those concerns.

The Court in *Turner* upheld a prison policy that restricted the exchange of non-legal mail between inmates in different institutions who were not family members. The Court stated that "[p]rison walls do not form a barrier separating prison

inmates from the protections of the Constitution." *Turner*, 482
U.S. at 84. The Court recognized, however, that "[r]unning a
prison is an inordinately difficult undertaking that requires
expertise, planning, and the commitment of resources, all of
which are peculiarly within the province of the legislative and
executive branches of government." *Id.* at 84-85. The Court
held that "when a prison regulation impinges on inmates' con-
stitutional rights, the regulation is valid if it is reasonably
related to legitimate penological interests." *Id.* at 89.

The Court in *Turner* provided a four-factor test for evaluat-
ing the reasonableness of a prison or jail regulation impinging
on a constitutional right. The Court ultimately accepted the
government's justification that correspondence between unre-
lated inmates at different institutions facilitated gang activity
and could be used to coordinate escape plans or violent acts.
482 U.S. at 91. It concluded that the policy "is content neu-
tral, it logically advances the goals of institutional security
and safety . . . , and it is not an exaggerated response to those
objectives." *Id.* at 93.

**[5]** The four-factor *Turner* test considers:

(1) whether the regulation is rationally related to a
legitimate and neutral governmental objective, (2)
whether there are alternative avenues that remain
open . . . to exercise the right, (3) the impact that
accommodating the asserted right will have on other
guards and prisoners, and on the allocation of prison
resources; and (4) whether the existence of easy and
obvious alternatives indicates that the regulation is
an exaggerated response by prison officials.

*PLN II*, 397 F.3d at 699 (citing *Turner*, 482 U.S. at 89). We
evaluate the policies of a jail or prison with "due regard for
the 'inordinately difficult undertaking' that is modern prison
administration," recognizing that "certain proposed interac-
tions, though seemingly innocuous to laymen, have poten-

tially significant implications for the order and security of the prison." *Thornburgh*, 490 U.S. at 407 (quoting *Turner*, 482 U.S. at 85).

We have applied the *Turner* test in four cases involving the distribution of literature to inmates. In each case, we have held unconstitutional prison policies that placed restrictions on the distribution of gift and solicited publications. In *Crofton v. Roe*, 170 F.3d 957, 960-61 (9th Cir. 1999), we struck down a regulation that prohibited a prisoner from receiving a book that had been ordered for him by his stepfather. We held that "although the state has had ample opportunity to develop a record, it has offered no justification for a blanket ban on the receipt of all gift publications." *Id.* at 960-61. In *Prison Legal News v. Cook ("PLN I")*, 238 F.3d 1145, 1151 (9th Cir. 2001), we struck down a ban on bulk-rate mail as applied to subscription non-profit publications. We noted that "the receipt of such unobjectionable mail [does not] implicate penological interests." *Id.* at 1149. In *Morrison v. Hall*, 261 F.3d 896, 898 (9th Cir. 2001), we extended the holding in *PLN I* and struck down a similar regulation as applied to "pre-paid, for-profit, subscription publications." We recognized that "the number of subscription *for-profit* publications that enter the [prison] may be greater than the number of subscription *non-profit* publications," *id.* at 902 (emphasis in original), but we noted that the government provided no evidence "regarding the impact that processing pre-paid, for-profit subscription publications would have on prison resources." *Id.* at 903 (emphasis omitted). Finally, in *Prison Legal News v. Lehman ("PLN II")*, 397 F.3d 692 (9th Cir. 2005), we struck down a prison ban on "non-subscription bulk mail" (publications that inmates request but do not pay for). We affirmed the district court's finding that "the ban on non-subscription bulk mail was not rationally related to a neutral government objective." *Id.* at 699.

Our dissenting colleague concludes that because a prison is a non-public forum, a publisher has no First Amendment

interest in distributing, and an inmate has no First Amend-ment interest in receiving, unsolicited publications. He there-fore concludes that the Court's four-part *Turner* test is inapplicable. We respectfully disagree.

**[6]** The Supreme Court and our court have consistently applied the *Turner* test to determine whether various forms of written communication with inmates are protected by the First Amendment. *See, e.g., Thornburgh* (applying *Turner* to prison regulation prohibiting specific publications); *Crofton v. Roe* (applying *Turner* to prison regulation banning gift publica-tions); *PLN I* (applying *Turner* to prison regulation banning bulk-rate mail); *Morrison v. Hall* (applying *Turner* to prison regulation banning bulk-rate, and third and fourth class, mail); *PLN II* (applying *Turner* to non-subscription bulk-rate mail). In the context of deciding whether the *Turner* test applies, we see no way to distinguish what was at issue in those cases from what is at issue here. All cases, including the case now before us, have individual challenges to prison or jail regula-tions forbidding various forms of written communications. The fact that in this case the publication was unsolicited may, of course, be taken into account in applying the *Turner* test. But the fact that the publication was unsolicited does not make the *Turner* test inapplicable.

We therefore review the jails' policies under the four-factor *Turner* test. Because we review summary judgments granted to defendants, we view the evidence in the light most favor-able to CJA.

   1.   "Rationally Related to a Legitimate Penological Objec-tive"

The first *Turner* factor is a *sine qua non*: "[I]f the prison fails to show that the regulation is rationally related to a legiti-mate penological objective, we do not consider the other fac-tors." *Ashker v. Cal. Dep't of Corr.*, 350 F.3d 917, 922 (9th Cir. 2003). But if the regulation is rationally related to a legit-

imate penological objective, that is not the end of the inquiry. The other three *Turner* factors must also be evaluated before a court can decide whether the prison regulation or policy is permissible.

### a.   Jail Security

**[7]** Officers at the Sacramento and Butte County jails assert that refusing to allow the distribution of unsolicited copies of CJA promotes security in the jails by reducing the likelihood of contraband entering the jail, and by reducing the amount of clutter in each inmate's cell thereby reducing the risk of fires and enabling efficient cell searches. The officers also assert that the policies promote security because, once in the jail, unsolicited publications are more likely than other publications to be used for "nefarious purposes" such as blocking lights or clogging toilets. We do not question the importance of reducing the likelihood of contraband entering the jails, reducing the risk of fire, and enabling efficient cell searches. Nor do we question the importance of discouraging or preventing inmates from using paper for improper purposes. However, defendants' general statements are undercut by the specific evidence they offer in an attempt to show the degree to which these purposes are actually served by a refusal to allow the requested distribution of CJA.

For example, Captain Jones of the Sacramento County jail stated in his deposition that until 2006 the jail accepted delivery of multiple unsolicited copies of the *Sacramento Bee* (the primary general circulation daily newspaper for the Sacramento area) on a "drop-off basis." The jail stopped delivery of the *Bee* in 2006, but for reasons unrelated to those it now gives for refusing to accept delivery of CJA. Captain Jones stated in his deposition, "I think at the time the Bee was stopped because of a perceived crusade against the sheriff's department during that time period." Captain Jones elaborated, "It was very expensive, as well, so I think it was a combination of factors, but I believe that their coverage of the

department during that time period was the catalyst to start looking at those other factors."

After delivery of the *Bee* was canceled, the jail accepted *USA Today* on an unsolicited drop-off basis. *USA Today* was cancelled after about a year because, according to Captain Jones, the jail no longer wished to pay for it. Captain Jones did not list security risks as among the "combination of factors" that motivated the jail's decision to stop distributing either unsolicited newspaper to inmates. He was specifically asked whether there was any diminution of incidents of "covering lights [and] clogging toilets" when *USA Today* was cancelled. He responded, "I wouldn't know. . . . I don't think we ever kept track of such numbers."

Captain Jones stated in his declaration that "inmates are not permitted to leave any materials in the common areas of the Jail," and that "[t]here are not materials which are made available to inmates by placing copies in any of the day rooms." However, he stated the opposite in his deposition: "[I]f someone has a subscription and gets done with it often times they'll put it out for the other inmates to read. . . . [I]f an inmate gets done with a novel, they might put it out for someone else to get[.]" When asked "Would an inmate be allowed to leave out a copy of Time Magazine when they're done with it?", Captain Jones answered "Yes."

Captain Jones sought to distinguish the security threat posed by the availability of newspapers in the common areas compared to the availability of CJA. He said in his deposition, "If there were one Crime, Justice & America in a housing unit, I don't think it would cause any greater security concern than a newspaper would." He was then asked, "What if there was three copies [of CJA]?" He responded, "Well, three would cause three times, you know, if you have a minor concern, then you have three times a minor concern, so it's still not — I don't think it would cause an error [sic] of panic, but nor would it be without consequence." Captain Jones did not

account for the fact that a general circulation newspaper ordinarily has more pages than CJA, nor for the fact that a new copy of a newspaper is typically delivered every day, whereas new copies of CJA would be delivered only weekly.

Lieutenant Bryan Flicker of the Butte County jail stated in his declaration that inmates at that jail already have access to paper that they use for improper purposes. He stated that Butte County jail inmates regularly misuse torn out pages from the telephone books the jail provides in every dayroom area, as well as from books donated to the jail by the local community. Lieutenant Flicker did not specify whether distribution of CJA was likely to increase the rate of such use of paper by inmates.

**[8]** Further, both jails already have separate policies regulating inmates' possession of property, including paper, in their cells. *See Morrison*, 261 F.3d at 902 ("In light of the regulation limiting the total amount of property in a cell, . . . permitting inmates to receive for-profit, subscription publications could not possibly increase the total volume of cell materials."); *see also PLN II*, 397 F.3d at 700; *PLN I*, 238 F.3d at 1150-51. It is thus unclear the degree to which allowing distribution of CJA in the jails would produce additional clutter in inmates cells or otherwise adversely affect jail security.

b.   Staff Resources

**[9]** Officers at both jails expressed concern that allowing delivery of unsolicited copies of CJA would require additional staff time. Officer James Fox of the Sacramento County jail stated in a declaration that there are 700 pieces of incoming mail and 600 pieces of outgoing mail per day at the jail. "The mail is processed during the night shift by a total of sixty (60) persons, thirty (30) individuals per shift over two (2) shifts. . . . A total of twenty-four (24) personnel hours are used per day on mail related duties at the Jail." But Officer Fox gave no estimate of how many additional personnel hours would be

required if CJA were delivered to the jail once a week at a ratio of one issue for every ten inmates. Officers at Butte County Jail provided no information quantifying the additional resources that would be required to distribute CJA. Indeed, they did not even provide information about the resources the jail currently devotes to mail delivery.

**[10]** Neither jail has suggested that unsolicited publications are more difficult to inspect and deliver than solicited publications. *Cf. PLN I*, 238 F.3d at 1150 ("The Department has presented no evidence supporting a rational distinction between the risk of contraband in subscription non-profit organization standard mail and first class or periodicals mail.").

c.    Slippery Slope

Captain Jones expressed a concern in his declaration that "to accept publications or magazines from one publisher would set an unworkable precedent for the Jail and could obligate the Jail to accept any other publications that appeared on the doorstep." But Captain Jones acknowledged in his deposition that the slippery slope problem was not a concern when the jail accepted unsolicited copies of the *Sacramento Bee* and *USA Today*. He specifically stated that the jail did not cease distributing the *USA Today* "because of any concern about a precedential value that it would set."

Captain Jones could recall "maybe three" requests to distribute unsolicited publications to inmates in Sacramento County jail since 2000. Of those three requests, Captain Jones could not remember if any were for regular publications as opposed to merely one-time-only leaflets. Butte County jail officers did not present any evidence about other requests to distribute unsolicited mail.

d.    Interference with Existing Advertising

**[11]** Sheriff Reniff of the Butte County Jail asserts as an additional interest his desire to maintain control over advertis-

ing of bail in the jail. Butte County jail has a contract with Partners for a Safer America, Inc. ("PSA"), under which PSA operates bulletin boards in the jail on which bail bond agents are allowed to post advertisements. PSA pays the jail a percentage of its profits from its sale of advertising space on the bulletin boards. Sheriff Reniff stated that distributing unsolicited copies of CJA to inmates would be inconsistent with the jail's contract with PSA. However, it is not clear on the record before us that, in fact, distributing CJA would be inconsistent with the contract.

[12] More important, it is obvious (though not stated by Sheriff Reniff) that if unsolicited copies of CJA are permitted in the jail, the value to bail bond agents of advertising on the jail bulletin boards will be diminished. That diminution in value may well be reflected in a lower price paid to PSA by the advertisers, and in a corresponding lower amount paid to the jail by PSA. We do not believe that a jail has a legitimate penological interest, for purposes of *Turner*, in protecting a profit made by impinging on inmates' First Amendment rights. Sheriff Reniff cites no case supporting such a proposition, and we are aware of none.

The Sacramento County jail, like the Butte County jail, has bulletin boards posted with information about bail bond agents. Unlike the Butte County jail, however, the Sacramento County jail is paid no money in return for allowing these postings.

2.    Alternative Avenues to Exercise the Right

[13] The second *Turner* factor is whether "other avenues remain available for the exercise of the asserted right." *Turner*, 482 U.S. at 90 (internal quotation marks and citation omitted). Defendants argue that CJA has alternative avenues to communicate with inmates because the jails will distribute CJA to inmates who request it. But there is a material question of fact whether, as a practical matter, Plaintiffs can effec-

tively reach county jail inmates if they can deliver CJA only
upon request.

In *Morrison*, 261 F.3d at 904, we held that the second *Turner* factor weighed against the legitimacy of a mail policy
when restricted publications would be delivered only if they
were sent at a higher rate. " '[P]aying a higher rate is not an
alternative because the prisoner cannot force a publisher who
needs to use, and is entitled to use, the standard rate to take
additional costly steps to mail his individual newsletter.' " *Id.*
(quoting *PLN I*, 238 F.3d at 1149). Here, unlike our earlier
cases, the jails' policies do not require inmates to pay for
CJA, or for CJA to mail its issues at a higher postage rate. *Cf.*
*Morrison*, 261 F.3d at 904.

However, in practice, it is difficult to create a broad aware-
ness of CJA among inmates in jails where, unlike in prisons,
populations turn over quickly. It is true that CJA can advertise
its publication to inmates through the yellow pages or televi-
sion, both of which are available in the jails, and through
word of mouth. But many inmates will have left the jail
before they can learn about the existence of CJA, request that
it be sent to them, and then receive it. Inmates typically want
information about bail bonds and attorneys as soon as they
arrive at the jail. For those who receive CJA only after a sig-
nificant wait, the advertising in CJA is of little or no use.

### 3.    Impact of Accommodating the Asserted Right

**[14]** The third *Turner* factor is "the impact accommodation
of the asserted constitutional right will have on guards and
other inmates, and on the allocation of prison resources gener-
ally." *Turner*, 482 U.S. at 90. "When accommodation of an
asserted right will have a significant 'ripple effect' on fellow
inmates or on prison staff, courts should be particularly defer-
ential to the informed discretion of corrections officials." *Id.*

**[15]** As discussed above, there are material questions of
fact as to whether, and to what degree, the jails would be

forced to expend significant additional resources if CJA is
delivered by either of the two methods sought by Plaintiffs.
Plaintiffs state that they are willing to work with jail officials
to make distribution as easy and efficient as possible. Plain-
tiffs seek to deliver only one copy of CJA for every ten
inmates each week, and have offered the jails the option of
either general delivery or individually addressed mailings. *Cf.
PLN I*, 238 F.3d at 1151. Officers at the jails have not
explained how mail inspectors will distinguish between a
copy of CJA that is solicited and one that is not. If the jails
have to compile subscription lists and compare incoming mail
to those lists, a ban on unsolicited mail could actually con-
sume more prison resources than accepting such mail. *Cf. id.*
(prison officials arguing that it is impractical to distinguish
between solicited and unsolicited mail).

### 4.  Exaggerated Response by Prison Officials

**[16]** The fourth *Turner* factor requires us to consider
"whether the existence of easy and obvious alternatives indi-
cates that the regulation is an exaggerated response by prison
officials." *PLN II*, 397 F.3d at 699. "This is not a 'least
restrictive alternative' test: prison officials do not have to set
up and then shoot down every conceivable alternative method
of accommodating the claimant's constitutional complaint."
*Turner*, 482 U.S. at 90-91. "[A]n alternative that fully accom-
modates the [asserted] rights at *de minimis* cost to valid peno-
logical interests" suggests that the "regulation does not satisfy
the reasonable relationship standard." *Id.* at 91. Here, the sug-
gested alternative is the limited distribution sought by Plain-
tiffs, compared to the outright ban imposed by the Sacramento
County and Butte County jails.

**[17]** The undisputed fact that CJA is currently distributed
in more than 60 counties throughout 13 states, including in 32
California county jails, suggests that the response of the two
jails in this case may be exaggerated. There is a marked con-
trast between defendants' strong general statements about the

ways the ban on unsolicited copies of CJA serves their penological purposes, on the one hand, and the weak, and to some degree contradictory, specific evidence they offer to support those statements, on the other. Further, defendants have not demonstrated that they cannot work with CJA to establish distribution schedules that minimize the drain on jail resources. Finally, the possibility that Butte County Jail's policy is motivated by a concern with losing revenue from bail bond advertisements also suggests that the jail's policy may be an exaggerated response.

### 5.    Summary

**[18]** Taking the evidence in the light most favorable to Plaintiffs and evaluating that evidence under the four *Turner* factors, we hold that neither defendant is entitled to summary judgment.

### B.   California Law

Defendants assert as a separate justification for their refusal to deliver unsolicited copies of CJA to inmates that distribution of CJA violates California's bail licensee regulations. The district courts did not reach this issue, and we decline to decide it in the first instance.

### Conclusion

**[19]** For the foregoing reasons, we reverse the district courts' orders granting summary judgment to Defendants. On the record before us, we cannot determine as a matter of law that Defendants have justified banning the unsolicited distribution of CJA to county jail inmates under the four-factor *Turner* test. We remand to the district courts for further proceedings consistent with this opinion.

REVERSED and REMANDED.

N.R. SMITH, Circuit Judge, dissenting:

Ray Hrdlicka publishes *Crime, Justice & America* ("CJA"), a glossy quarterly publication that is distributed for free to prison inmates across the United States. Hrdlicka has chosen a free distribution model of business in which CJA is either given to correctional facilities to be put in common areas on a weekly basis or sent to a list culled from the inmate rolls (which are public record). Apparently, it has been a successful business model. Since its introduction in 2002, over one million copies of CJA have been distributed to inmates across the United States. CJA's revenue comes from its advertisers, who are primarily bail bonds agents and lawyers. In soliciting advertisers, CJA claims the advertisements will be seen by "hundreds to thousands" of pre-trial inmates.

Hrdlicka now asks this court to assist him in further increasing the circulation of CJA over the objections of two sheriffs who believe that accommodating Hrdlicka's distribution model would burden the administration of their correctional facilities. While we have previously found that the First Amendment guarantees Hrdlicka access to prisoners that have requested CJA, there have been no prisoner requests here. Further, there is no precedent suggesting that the First Amendment guarantees Hrdlicka the special right to sue any sheriff who refuses to be a *de facto* distribution arm of the CJA.

The majority holds that there is a "First Amendment interest in distributing and receiving unsolicited publications." It cites *Klein v. City of San Clemente,* 584 F.3d 1196 (9th Cir. 2009), for the proposition that the First Amendment protections do not depend on the request of the recipient. *Klein,* however, explicitly deals with First Amendment restrictions in "public fora." 584 F.3d at 1200-01. Prisons are not public fora. *See United States v. Douglass*, 579 F.2d 545, 549 (9th Cir. 1978). Instead prisons are one of a few "public institutions which do not perform speech-related functions at all . . .

[where] the government is free to exclude even peaceful speech and assembly which interferes in any way with the functioning of those organizations." *Id.; see also Adderley v. State of Florida*, 385 U.S. 39, 41 (1966) ("Jails, built for security purposes, are not [public fora].")

The majority's statement, that "*Turner* [*v. Safely,* 482 U.S. 78 (1987)] addresses" any "concerns" regarding the difference between public fora and prisons, is unavailing. As the Supreme Court stated in *Turner*, "[o]ur task, then . . . is to formulate a standard of review for *prisoners' constitutional claims*[.]" 482 U.S. at 85 (emphasis added). No prisoners' constitutional claims are implicated in this case. Both before and after *Turner,* the Supreme Court and this court have uniformly and frequently cautioned against a judicial rule allowing publishers of unsolicited publications a right to demand distribution within prisons. *See Morrison v. Hall*, 261 F.3d 896, 905 (9th Cir. 2001) ("[P]risons *can* and have adopted policies permitting prisoners to receive [requested] publications, while at the same time, prohibiting prisoners from receiving unsolicited junk mail.") (emphasis added); *Prison Legal News v. Lehman*, 397 F.3d 692, 701 (9th Cir. 2005) (Distinguishing *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119 (1977), by stating: "In this case, every piece of mail sent by PLN is sent as a result of a request by the recipient . . . it is the fact that a request was made by the recipient . . . that is important.")

No party disputes that we have no request on a part of any prisoner to receive the CJA. Prisoners' First Amendment rights are not implicated in any way. Instead, Hrdlicka is asking the court to create a special rule, under the First Amendment, protecting his chosen method of distributing CJA to inmates.

Any First Amendment analysis involving prisons must be couched in the understanding that:

[C]ourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. . . . Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have . . . additional reason to accord deference to the appropriate prison authorities.

*Turner*, 482 U.S. at 84-85 (discussing *Procunier v. Martinez*, 416 U.S. 396 (1974) (internal quotation marks and citations omitted). With this understanding, the Supreme Court has held that the press has "no constitutional right of access to prisons or their inmates beyond that afforded the general public." *Pell v. Procunier*, 417 U.S. 817, 834 (1974). While *Pell* dealt with the press attempting to access prisons in order to gather information, it remains one of the only cases that has dealt with the press's right of access to prisons when no concurrent right of prisoners has been implicated.[1]

Just as the press had no special right of access to prisons in *Pell*, here Hrdlicka has no special right to demand a sheriff accept one of his chosen methods of distribution, especially given that a prison is not a public forum. If Hrdlicka would like prisoners to read CJA, he has the option of spending the time and money that all other members of the press spend in order to acquire new readership. Namely, Hrdlicka can advertise both in and outside of the jail in an effort to convince inmates (or noninmates) to request his publication.[2] He can

---

[1]*Pell* also dealt with an inmate's right of access to the press. However, the analysis was done separately from the press's right of access to the prison. *See Pell*, 417 U.S. at 823-828.

[2]No inmate has been refused a requested copy of CJA.

also rely on the word of mouth that many publications take the time to develop among their readers. While this method of acquiring readers may be costly, in the context of prisons, losing "cost advantages does not fundamentally implicate free speech values." *Jones*, 433 U.S. at 130-31; *see also Cornelius v. NAACP Legal Defense and Education Fund, Inc.*, 473 U.S. 788, 809 (1985) ("The First Amendment does not demand unrestricted access to a non-public forum merely because use of that forum may be the most efficient means of delivering the speaker's message."). Hrdlicka has chosen not to advertise to acquire new readership. Instead, he seeks the cost advantage of automatic distribution at any jail he chooses to target. He does not have such a right.

The majority's analysis under *Turner* further demonstrates the problem with finding a special First Amendment right for Hrdlicka's distribution method. By allowing CJA the right to demand unrequested distribution, the majority forces sheriffs either to allow all unrequested mail to reach inmates or to make a case by case determination of the quality of the publication. In discussing the *Turner* factors, the majority notes "[f]or those who only receive CJA after a significant wait, the bail bond advertising in CJA is of little or no use." But the Supreme Court has dictated that the value of information to inmates is not a valid consideration. "[T]he *Turner* test, by its terms, simply does not accommodate valuations of content." *Shaw v. Murphy*, 532 U.S. 223, 230 (2001). The majority would now require valuation of content for any publisher or bulk mail advertiser that asked for access to prisons (if no valuation is to be made then the majority would suggest that all unrequested mail should be allowed unless *Turner* is satisfied). Such assessment is impossible under Supreme Court precedent.

Instead, the simpler and saner rule is that Hrdlicka has no special First Amendment right to demand that a prison agree to one of his distribution methods. A prison is not a public forum, and a ban on unrequested publications is a content

neutral method for sheriffs to ensure efficient administration of their facilities. A publisher wishing to develop readership among prisoners is free to advertise or develop word of mouth programs to encourage the request of a publication. The publisher is not entitled to use the First Amendment for cost savings in acquiring new readers. Therefore, Hrdlicka does not have a special First Amendment right to demand distribution in prisons, and Sheriffs Reniff and McGuinnes are entitled to summary judgment.