UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRIME, JUSTICE & AMERICA, INC., | No. 2:08-cv-00343-TLN-EFB |
| Plaintiff, | |
| v. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW; ORDER** |
| KORY HONEA, in his official capacity of Sheriff of the County of Butte, California, | |
| Defendant. | |

From November 17, 2014, through November 20, 2014, this Court presided over a bench trial wherein the Court heard testimony from witnesses. Pursuant to the stipulation of the parties, closing arguments were submitted in writing. Following this Court's ruling on Defendant Kory Honea's ("Defendant") motion pursuant to Rule 52 of the Federal Rules of Civil Procedure, the sole remaining issue of liability is whether Plaintiff Crime Justice & America, Inc. ("Plaintiff" or "CJA"), established that the First Amendment was violated when the County denied distribution of its publication Crime Justice & America in the Butte County jail.[1] Plaintiff seeks damages, and declaratory and injunctive relief. The Court, having heard the arguments of counsel, and having reviewed all the papers and documents on file herein, as well as the testimony and

---

[1] On November 20, 2014, this Court ruled on Defendant's Rule 52 motion and found that: (1) former plaintiff Ray Hrdlicka lacked standing to pursue this case because he no longer owned a financial interest in CJA; and (2) CJA had failed to prove its equal protection claim because it had not shown that the publication belongs to a protected class or that it was treated differently from other similarly situated persons or publications.

evidence presented at the trial, makes the following findings of fact and conclusions of law.[2]

### I. FINDINGS OF FACT

#### A. CJA Background and Business Model

1. Plaintiff publishes Crime, Justice & America ("CJ&A"),[3] a magazine intended for newly arrested jail inmates awaiting trial. The majority of articles in the magazine are relevant to pretrial issues in criminal cases and are often written by attorneys and other relevant experts in the law enforcement and/or field of criminal law. (Trial Tr., Vol. I, pp. 53:10–16, 59:8–14, 56:5–11.)

2. CJA began distribution to inmates in county jails in 2002. (Trial Tr., Vol. I, p. 21:20–21.) The magazine is a 36–40 page publication, with four pages of advertisements. (Trial Tr., Vol. I, p. 30.)

3. The articles are intended to provide information to inmates regarding the criminal process, common legal issues in criminal cases, and assistance in dealing with issues relevant to the case and life beyond the criminal charge. (Trial Tr., Vol. I, pp. 53:10–16, 54:19–23, 56:5–11.)

4. Over the course of 12 years, CJA has received between 2,500 to 3,000 letters from inmates. (Trial Tr., Vol. I, p. 110:24–25.) The substantive editorial content of CJA presents no security issues with jails.

5. Inmates are provided the magazine for free, leaving the company to obtain revenues only from advertisers. (Trial Tr., Vol. II, p 31:20–21.) CJA tried to offer subscriptions to the publication for a short period of time but found that it was not cost effective. (Trial Tr., Vol. II, p. 204:3–7.)

6. CJA sells four (4) pages of advertisements in the publication. Ad space is

---

[2] In addition to the closing briefs, the parties filed numerous motions concerning leave to file over-length briefs (ECF Nos. 141, 143), and Defendant filed a motion to reopen the case for the limited purpose of submitting the declaration of Captain Jerry Jones (ECF No. 138). Although the Court does not look kindly on the parties' requests for extended page limits in light of the fact that this Court already extended the parties' page limits, in an effort to conclude this litigation that has been pending since 2008, the Court hereby acquiesces and GRANTS the parties' requests to file over-length briefs (ECF Nos. 141, 143), and Defendant's motion to reopen the case for the limited purpose of submitting the declaration of Captain Jerry Jones (ECF No. 138).

[3] The Court uses "CJ&A" to identify the publication and "CJA" to identify both the company and Plaintiff in this action.

available to a maximum of three (3) attorneys and one (1) bail bond company.  (Trial Tr., Vol. II, p. 202:12–16.)  The advertisement space can be purchased by other entities.  (Trial Tr., Vol. II, p. 201:1–6.)

7.  Advertisers are geographically specific, meaning that an advertiser will only want or need to advertise in the county in which they practice or operate.  (Trial Tr., Vol. I, p. 35:15–25.)

8.  In the majority of the counties in which CJA distributes, it uses a general distribution manner.  (Trial Tr., Vol. I, p. 36:9–13.)  The ratio of magazines that would go into the jail equals one magazine per every ten inmates.  (Trial Tr., Vol. I, p. 39:3–7.)  In other facilities where CJA utilizes general distribution, they

> drop an amount equal to ten to one, ten inmates, one magazine, throughout all of the common areas.  So if a common area has 60 inmates that have access to that common area, once a week, the jail personnel, at the same time as they're usually delivering newspapers or delivering mail, simply drop a stack of six magazines in the common area.

(Trial Tr., Vol. I, p. 39:10–16.)

9.  The second distribution method requires CJA to individually address the publication to inmates and have it distributed via the United States Postal Service.  This method is substantially more costly and takes more time.  (Trial Tr., Vol. I, p. 36:14–19.)  CJA found this method to be ineffective because during the time period that it takes to compile a mailing list many inmates are moved to different facilities or released and thus did not receive the publication in a timely manner.  (Trial Tr., Vol. II, pp. 206:6–14, 225:09–22.)

10 .  Before CJA attempts to sell advertising in a specific county, the publisher contacts the local jail authorities.  (Trial Tr., Vol. I, pp. 36:23–37:10.)  This contact is for two purposes: First, the publisher wants to be sure that there won't be any issues with distribution, and confirm distribution will proceed.  Second, the publisher wants to inform the jail of the two potential distribution methods, i.e. that the magazine can be mailed, individually addressed to specific inmates or that the jail could choose to have a stack of magazines dropped off weekly and distributed in the jail common rooms.  (Trial Tr., Vol. I, p. 37:1–6.)

B.    Butte County Jail Policies and Procedures

11.    Butte County jail houses, on average, 580–590 inmates daily. (Trial Tr. Vol. IV, p. 576:24–25.) Butte County employs "a remote surveillance, direct observation" where an officer is in a particular housing area only for a few minutes every hour. (Trial Tr. IV, pp. 580–581.) There is an older portion of the jail where a "linear" model is used, which requires an officer to do hourly checks from the hallway, but the officer does not go into the housing unit. (Trial Tr. Vol. IV, pp. 580–581, 612-613, 616.) Although a "direct supervision" model, which utilizes an officer directly in the housing unit, allows a lot more control over the inmates, it is more staff intensive.[4] Thus staffing concerns prevent Butte County jail from employing this model. (Trial Tr. Vol. IV, p. 616:3–8.)

12.    The Jail promulgates rules for inmate conduct and administers discipline for violations. (Exhibit P, pp. 22–31). The purpose of these rules are for safety and security. (Trial Tr. Vol. IV, pp. 604–606.) The jail estimated that since 2010, around 3400 rule violations involving paper products occurred. (Trial Tr. Vol. IV, pp. 607:5–608:18.)

13.    Paper abuses have been an important and ongoing problem in the jail. Inmates at Butte County jail tear pages from the phonebooks and use them for nefarious acts, including covering windows, covering lights, air vents, passing notes, covering speakers, hiding contraband, and making projectiles and weapons. (Dep. Trans Hays, oo. 52:1–10, 52:24–25; Trial Tr. Vol. IV, pp. 564:22–565:17; 604-606.)

14.    In an effort to prevent paper violations, Butte County Jail has enacted rules that limit the amount of paper products in each inmate's cell. Inmates are permitted to keep up to three (3) inches of paper items in their cell, excluding legal documents. (Trial Tr. Vol. IV, pp. 628:10–14, 629:21–630:1, 629:3–6.)

15.    Butte County jail also has a mail distribution policy that prohibits the distribution of unsolicited commercial mail. (Exhibit S at 2.) The policy was written in September of 2004. (Trial Tr. Vol. IV, p. 588–90.) Bryan Flicker ("Flicker"), a correctional lieutenant in the

---

[4] The officer in the housing unit can see the interactions and behaviors of the inmates, which allows for more control.

4

administrative unit, testified that the policy had been utilized prior to that date, but was memorialized in 2004 to reflect the jail's practice. (Trial Tr. Vol. IV, p. 589.) The policy does not bar inmates from receiving mail which they subscribe to or handing out those subscriptions to other inmates, who have not subscribed to the magazine. (Trial Tr. Vol. III, p. 534:12–24.)

16. Flicker testified that the purpose behind the written policy was to stop unsolicited mail. (Trial Tr. Vol. IV, p. 589.) When asked why the jail would want to stop unsolicited mail, Flicker stated "[b]ecause inmates use paper they don't have ownership of to create disturbances in the facility. Cover lights, cover windows, cover speakers." (Trial Tr. Vol. IV, p. 591:7–9.)

17. Flicker testified that inmates are often found using torn pages from the books to hide contraband, start fires, plug their toilets, or cover the windows and/or lights in their cells. (Trial Tr. Vol. IV, p. 606:17–22.)

18. Jerry Jones ("Jones"), operations commander at Butte County Jail, testified that he believed that inmates were less likely to use attorney-client mail, personal mail, or solicited commercial publications than unsolicited mail for improper purposes. (Trial Tr. Vol. IV, 565:23–566:3, 566:11–20.)

19. Flicker testified that the jail recently installed kiosks with monitors "[t]o eliminate paper products from availability to inmates as much as we can." (Trial Tr. Vol. IV, p. 619:21–22.) The jail installed thirty-one (31) kiosks with monitors throughout the jail, in the cells and common areas. (Jones Decl., ECF No. 138-1.) In addition, Butte County jail also has two portable kiosks available. (Jones Decl., ECF No. 138-1.) The monitors are touch screen and could have documents in PDF format to access and view. (Jones Decl., ECF No. 138-1.)

C. <u>CJA's Interactions with Butte County Jail</u>

20. In August 2004, CJA approached Butte County Jail about distributing its publication within the facility. (Trial Tr., Vol. I, p. 73:24–74:3; Trial Tr., Vol. II, p. 248:16–22.)

21. CJA was informed that Butte County would not allow the publication because it was against its mail policy. (Trial Tr., Vol. I, p. 75:25–76:11.) At the time, Butte County was provided with several copies of CJ&A. (Def's Ex. EE.)

22. In response to CJA's request to distribute its publication, County Counsel met with

1  representatives of the Sheriff.  In September 2004, County Counsel, on behalf of the Sheriff,

2  notified CJA that the Sheriff had a policy of prohibiting unsolicited commercial mail, and that the

3  advertising within CJA may be illegal pursuant to Title 10 C.C.R. section 2074[5] and California's

4  Business and Professions Code section 6152.[6]  (Pl's Ex. 7.)

5        23.    In July and August 2005, the then Chief Counsel for the California Department of

6  Insurance, Gary Cohen, publicly announced his opinions as to CJA's advertisements in another

7  case involving Plaintiff, *Hrdlicka v. Cogbill*, United States District Court for the Northern District

8  of California, Case No. 04-CV-03020.  (Exhibit R).  In his first declaration, Mr. Cohen explained

9  that it was the Department's position, and his expert opinion, that sending unsolicited copies of

10  CJA directly or in bulk to inmates in the Sonoma County Jail which contain bail advertisements

11  would violate Sections 2074 and 2076 of Title 10 of California's Code of Regulations.  (Def.'s

12  Ex. R, p. 3:4–6.)  Mr. Cohen also stated that the jail "would be a party to the violation, as it would

---

[5]  Cal. Code Regs. tit. 10, § 2074 states:

"Except as provided in Sections 2074 and 2079.5, no bail licensee shall solicit any person for bail in any prison, jail, or other place of detention of persons, court or public institution connected with the administration of justice; or in the halls or corridors adjacent thereto; provided that a bail licensee may in such halls, corridors or in other rooms or areas where not prohibited by local rule or ordinance transact bail with persons specified in Section 2079 who have prior to transaction, requested his services."

[6]  Cal. Bus. & Prof. Code § 6152 (West) states as follows:

(a) It is unlawful for:
(1) Any person, in an individual capacity or in a capacity as a public or private employee, or for any firm, corporation, partnership or association to act as a runner or capper for any attorneys or to solicit any business for any attorneys in and about the state prisons, county jails, city jails, city prisons, or other places of detention of persons, city receiving hospitals, city and county receiving hospitals, county hospitals, superior courts, or in any public institution or in any public place or upon any public street or highway or in and about private hospitals, sanitariums or in and about any private institution or upon private property of any character whatsoever.
(2) Any person to solicit another person to commit or join in the commission of a violation of subdivision (a).
(b) A general release from a liability claim obtained from any person during the period of the first physical confinement, whether as an inpatient or outpatient, in a clinic or health facility, as defined in Sections 1203 and 1250 of the Health and Safety Code, as a result of the injury alleged to have given rise to the claim and primarily for treatment of the injury, is presumed fraudulent if the release is executed within 15 days after the commencement of confinement or prior to release from confinement, whichever occurs first.
(c) Nothing in this section shall be construed to prevent the recommendation of professional employment where that recommendation is not prohibited by the Rules of Professional Conduct of the State Bar of California.
(d) Nothing in this section shall be construed to mean that a public defender or assigned counsel may not make known his or her services as a criminal defense attorney to persons unable to afford legal counsel whether those persons are in custody or otherwise.

1  be required to participate in the direct distribution and solicitation procedure." (Def.'s Ex. R, p

2  4:14–16).  Brad Stephens ("Stephens"), a chief deputy county counsel in the Butte county

3  counsel's office, testified that the County, through County Counsel was aware of these

4  declarations. (Exhibit R. p. 5; Trial Tr., Vol III, pp. 481–482; Exhibit L, p. 5)  Jones testified that

5  he met with Flicker and Stephens about CJA's request to distribute and that he was advised by

6  Stephens that there were legal concerns about the attorney advertisements and/or bail bond

7  advertisements. (Trial Tr., Vol. IV, pp. 555–57.)

8      24.  In February 2007, the publisher of CJA sent Butte County a public records request

9  seeking information regarding Butte County jail inmates.  Subsequently, via a telephone

10  conversation between its publisher and a Butte County deputy counsel, CJA made a new request

11  to distribute in Butte County jail. (Ex. L.)

12      25.  In March 2007, Defendant sent CJA a letter denying distribution and reiterating its

13  past reasons for denying CJA's request. (Pl.'s Ex. 17.)

14      26.  Defendant has offered to provide Plaintiff's publication in other ways.  For

15  example, the jail has a library to which inmates can request access. (Exhibit BB).  California's

16  CDCR Principal Librarian stated, "[i]n my professional opinion, I would recommend your

17  magazine as an acceptable donation to the California Department of Corrections Law Libraries."

18  (Exhibit Q).  Defendant has also offered to make CJA available on the jail kiosks. (Trial Tr. Vol.

19  IV, p. 622:7–10.)

20      **II.**    **CONCLUSIONS OF LAW**

21      A.    <u>First Amendment Framework</u>

22      27.  Where a First Amendment interest is implicated, the Court applies the four-factor

23  *Turner* test to decide whether that interest gives rise to a protected First Amendment right.  *See*

24  *Turner v. Safely*, 482 U.S. 2254 (1987); *see also Hrdlicka v. Reniff*, 631 F.3d 1044, 1049 (9th Cir.

25  2011) (applying *Turner*).  The Ninth Circuit has repeatedly recognized that publishers and

26  inmates have a First Amendment interest in communicating with each other and has thus applied

27  *Turner* in these situations.  *See Hrdlicka*, 631 F.3d at 1050 (9th Cir. 2011) ("The Supreme Court

28  and our court have consistently applied the *Turner* test to determine whether various forms of

written communication with inmates are protected by the First Amendment."); *Prison Legal News v. Lehman*, 397 F.3d 692, 699 (9th Cir. 2005) [hereinafter *PLN II*] (applying *Turner* and striking down a prison ban on "non-subscription bulk mail" (publications that inmates request but do not pay for)).

28. Thus, this Court applies the four-factor test from *Turner* and considers:

>(1) whether the regulation is rationally related to a legitimate and neutral governmental objective;
>
>(2) whether there are alternative avenues that remain open ... to exercise the right;
>
>(3) the impact that accommodating the asserted right will have on other guards and prisoners, and on the allocation of prison resources; and
>
>(4) whether the existence of easy and obvious alternatives indicates that the regulation is an exaggerated response by prison officials.

Turner, 482 U.S. at 89.

29. In doing so the Court "evaluates the policies of a jail or prison with 'due regard for the 'inordinately difficult undertaking' that is modern prison administration, recognizing' that 'certain proposed interactions, though seemingly innocuous to laymen, have potentially significant implications for the order and security of the prison.'" *Hrdlicka*, 631 F.3rd at 1050 (quoting *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989)).

30. "The rational relationship factor of the Turner standard is a sine qua non." *Prison Legal News v. Cook*, 238 F.3d 1145, 1151 (9th Cir. 2001) [hereinafter *PLN I*]. "[I]f the prison fails to show that the regulation is rationally related to a legitimate penological objective, we do not consider the other factors." *Ashker v. Cal. Dep't of Corr.*, 350 F.3d 917, 922 (9th Cir. 2003). If the Court finds that the regulation is rationally related to a legitimate penological objective, that is not the end of the inquiry. The other three *Turner* factors must also be evaluated before a court can decide whether the prison regulation or policy is permissible. *Hrdlicka*, 631 F.3rd at 1051.

///

///

B.     Whether the Prison's Policy is Rationally Related to a Legitimate Penological Objective

31.    The first inquiry under the Turner test is whether there is a common sense connection between the jail's stated interest and the challenged policy. *Mauro v. Arpaio*, 188 F.3d 1054, 1059 (9th Cir. 1999). The first element of the Turner test directs the court to (1) determine whether the regulation is legitimate and neutral; and (2) assess whether there is a rational relationship between the government objective and the challenged jail regulation. *PLN I*, 238 F.3d at 1149; *Ashker v. Cal. Dep't. of Corr.*, 350 F.3d at 92. "Defendant must demonstrate both that those specific interests are the actual bases for their policies and that the policies are reasonably related to the furtherance of the identified interests. An evidentiary showing is required as to each point." *Casey*, 4 F.3d at 1528.

32.    If a common-sense connection is established, the plaintiff then must refute it. If the plaintiff refutes the common-sense connection, the burden then shifts to the prison official to present enough counter-evidence to show that the connection is not so "remote as to render the policy arbitrary or irrational." *PNL I*, 238 F.3d at 1150. However, if the plaintiff does not present evidence sufficient to refute a common-sense connection between the regulation and the government objective, "prison officials need not prove that the banned material actually caused problems in the past, or that the materials are 'likely' to cause problems in the future." *Mauro*, 188 F.3d at 1060. "The only question is whether prison administrators reasonably could have thought the regulation would advance legitimate penological interests." *Ashker*, 350 F.3d at 922–23.

33.    Defendants have offered four reasons for the Butte County jail's mail policy: (1) jail security; (2) lack of staff resources; (3) the slippery slope argument; and (4) concerns that the publication violates existing advertising statutes. The Court finds that the first three proffered reasons are related and thus discusses them jointly. For the reasons stated below, the Court finds that Defendant's policy is rationally related to the jail's security and staffing, which are legitimate penological objectives. As to Defendant's argument concerning whether advertisements within the magazine adhere to California's advertising laws, the Court finds that this reason for not

distributing the publication is disingenuous in light of Plaintiff's persistent willingness to rectify any such violations. However, because the Court finds that Defendant's policy is rationally related to the jail's security and resources, the Court declines to decide the legality of advertisements within Plaintiff's publication.[7]

34. Defendant asserts that paper products within the jail create security risks and that the jail does not have the resources to properly address the security issues because of a lack of staff resources. In conjunction, Defendant states that if the jail was required to allow CJA distribution that it would have to allow other unsolicited mail which in turn would create more of a burden on the jail's resources. (ECF No. 137 at 7.)

35. Jail security, is beyond question, a legitimate interest. *See Turner*, 482 U.S. at 86. Furthermore, the Court notes that the policy at issue is neutral because it applies to all unsolicited mail regardless of content. *PLN I*, 238 F.3d at 1149. Thus the Court turns to whether the policy at issue is rationally related to achieving that interest.

36. During the trial, Defendant presented evidence that paper poses security issues at Butte County jail. (Dep. Trans Hays, 52:1–10, 52:24–25; Trial Tr. Vol. IV, pp. 564:22–565:17; 604-606, 607:5–608:18.) Defendant also presented evidence that unsolicited publications are more likely than other publications to be used for "nefarious purposes" such as blocking lights or clogging toilets. (Dep. Trans Hays, 52:1–10, 52:24–25; Trial Tr. Vol. IV, pp. 564:22–565:17; 604-606; 607:5–608:18.) In an effort to limit paper throughout the facility, Butte County jail recently installed kiosks with touch screen monitors to eliminate paper products from availability to inmates as much as possible. (Jones Decl., ECF No. 138-1; Trial Tr. Vol. IV, pp. 619:21–22.) Thus, Defendant has presented evidence that paper products have caused security risks throughout the facility and that such products continue to cause safety and staffing concerns.

37. Plaintiff proposed to distribute its publication by placing copies of the publication in common areas. (Trial Tr., Vol. I, p. 39:10–16.) There is no question that distribution of

---

[7] Although this Court makes no determination as to the legality of the advertisements contained within CJ&A, the Court notes that according to Stephen's highly questionable interpretation of the term "testimonial," all advertisements would be considered testimonials. The Court cautions Defendant to abstain from such an overly broad interpretation in further assessing advertisements within CJ&A as it may pertain to future electronic distribution of the publication.

Plaintiff's publication would create more paper within the facility and that allowing other unsolicited mail would compound this issue. Furthermore, although there is a policy that limits the amount of paper in inmate's cells, this limitation does not defeat problems arising from paper products in common areas. Therefore, the Court finds that the evidence supports a common-sense connection between Defendant's policy of disallowing unsolicited mail in order to limit the amount of paper products available to inmates and its effort to prevent paper infractions.

38. In response, Plaintiff offered the testimony of Richard Lichten ("Lichten"), who worked for over 30 years at seven jails and retired as a lieutenant. Lichten testified that he had the opportunity to observe the effect of reading materials being provided to inmates. Lichten specifically worked at facilities where CJ&A was distributed and testified that he had witnessed inmates reading the publication, but that to his knowledge the magazine was never used in acts concerning jail security. (Trial Tr. Vol. I, p. 91:11–13.) Lichten also testified that he didn't believe that the presence of CJ&A within the jails would result in more paper violations:

> BY MR. FREEMAN: Did you have an opportunity to observe whether the presence of Crime, Justice & America affected the frequency of these acts engaged in by inmates?
>
> …
>
> THE WITNESS: The best way for me to answer that is I can't remember one time where that specific magazine in and of itself was used as a weapon or in some malicious purpose. There's always papers around for inmates to use if that's what they choose to do.
>
> Q. BY MR. FREEMAN: Did you ever observe inmates using subscribed magazines as weapons?
>
> A. Sure.
>
> Q. Did you ever observe inmates using subscribed magazines to cover lights?
>
> A. Usually they would use newspapers or toilet paper or paper napkins, but on occasion they would tear up magazines to cover lights, yes.
>
> Q. How about covering windows?
>
> A. It's been my experience that the preferred method, at least the jails I worked at, was wet toilet paper because it's easy to use, it's not -- you know, it's accessible, and it sticks well. Sometimes they

> will take paper and use toothpaste as glue and cover up the windows, which should never be allowed.
>
> Q. How about clogging toilets, use subscription magazines for that?
>
> A. That's a bad thing to use. If you want to clog up a toilet, you use blankets or sheets or clothing. It's just a pain in the neck to use paper because you have to rip up so much of it.
>
> Q. How about for starting fires?
>
> A. Starting fires, the preferred way to start fires is using toilet paper. It's easy to catch fire.
>
> Q. While you were at the North County Correctional Facility, did you ever observe inmates using personal letters for acts that concerned jail security?
>
> A. Sometimes contraband would be hidden within the letters. That's why you have to, during a proper jail check, open up each letter, not necessarily to read their personal stuff, but you want to look for contraband.
>
> Q. How about things like starting fires or passing notes, are personal letters ever used for that?
>
> A. Ah, I can't remember inmates using their own letters to start fires. Again, toilet paper is the preferred, ah, fire fuel in my experience because it's so easy to catch.

(Trial Tr. Vol. I, pp. 93:16–95:1.)

39. The Court finds that Lichten's testimony is not enough to refute the jail's proffered evidence that the use of paper for nefarious acts creates a security risk in Butte County jail and that the jail's policy of prohibiting unsolicited mail is rationally related to reducing the amount of paper available for such acts. Lichten has not worked in Butte County jail and thus cannot speak to the problems that are faced within that facility. Moreover, Plaintiff cannot show that the policy was arbitrarily applied to CJA. Defendant presented evidence that other unsolicited publications were prevented from being distributed prior to Plaintiff approaching Butte County jail about distribution. (*See* Trial Tr. Vol. III, pp. 480:18–481:17.)

40. Because Plaintiff has failed to refute a common sense connection, Defendant has met his burden. *See Ashker*, 350 F.3d at 923 (stating that prison officials need not prove that the banned material actually caused problems in the past, or that the materials are likely to cause problems in the future, only that prison administrators reasonably could have thought the

12

1  regulation would advance legitimate penological interests); *Mauro v. Arpaio*, 188 F.3d 1054,
2  1060 (9th Cir. 1999) (holding the same).

3     C.  <u>Alternative Avenues</u>

4     41.  The second factor the Court considers in determining the reasonableness of the
5  policy's restriction on constitutional rights is "whether there are alternative means of exercising
6  the right that remain open to prison inmates." *Turner*, 482 U.S. at 90. "Where other avenues
7  remain available for the exercise of the asserted right, courts should be particularly conscious of
8  the measure of judicial deference owed to corrections officials in gauging the validity of the
9  regulation." *Mauro*, 188 F.3d at 1061 (internal quotations omitted).

10    42.  Aside from the obvious fact that Plaintiff could distribute to inmates that
11 subscribed to the publication, Defendant has proposed two alternatives for making Plaintiff's
12 unsolicited materials available to Butte County jail inmates: the law library and kiosks.

13       i.  *The Law Library*

14    43.  Flicker testified that Butte County jail would allow two copies of Plaintiff's
15 publication to be placed in the jail's law library. (Trial Tr. Vol. IV, p. 626:04–10.) Furthermore,
16 California's CDCR Principal Librarian stated, "[i]n my professional opinion, I would recommend
17 your magazine as an acceptable donation to the California Department of Corrections Law
18 Libraries." (Exhibit Q).

19    44.  Inmates must request access to the law library in order to use it, but all requests are
20 honored. (Trial Tr. Vol. IV, p. 625:15–20.) Once an inmate requests access, it takes one to three
21 days, depending on the inmates' housing, to gain access. (Trial Tr. Vol. IV, p. 625:21–25.)
22 Generally, two inmates are allowed to use the law library at one time, which allows on average
23 for 25 inmates a day to use the law library. (Trial Tr. Vol. IV, p. 625:11–14.)

24    45.  Plaintiff contends that the law library is not a viable alternative because of: (1) the
25 limited access; (2) the inmate's lack of knowledge of CJ&A would prevent him or her from
26 gaining access to it; and (3) the fact that inmates would not be permitted to take a copy of CJ&A
27 with them in the event that they found an article they wanted to read. (ECF No. 135 at 17.)

28    46.  The Court agrees that standing alone, the law library does not present an adequate

means for Plaintiff to communicate its existence to inmates. In practice, it is difficult to create a broad awareness of CJA among inmates in jails where, unlike in prisons, populations turn over quickly. Thus, although CJA can advertise its publication to inmates through the yellow pages or television, many inmates will have left the jail before they can learn about the existence of CJ&A, request that it be sent to them and then receive it. *See Hrdlicka*, 631 F.3d at 1054. So, the Court turns to Defendant's other alternative, the kiosks,[8] to determine whether it alone or in conjunction with the law library is viable.

### ii. Kiosks

47. The jail has now installed thirty-one (31) kiosks with monitors throughout the jail, in the cells and common areas. Two portable kiosks with monitors are also available. (Jones Decl., ECF No. 138-1.) The kiosk's monitors are touch screen and allow for PDF formatted documents to be accessed and viewed. (Trial Tr. Vol. IV, p. 626:15–25.)

48. The goal of installing the kiosks is to alleviate the need for paper forms such as . . . "request forms, the property release forms, the money release forms, the sick slips, grievance forms, the handbook." (Trial Tr. Vol. IV, p. 617:11–15.) "All those documents [will be accessible] on those kiosks in electronic format to eliminate the paper from the housing unit." (Trial Tr. Vol. IV, p. 617:11–15.)

49. The kiosks are available to all inmates from 9:00 am through 11:00 pm. (Trial Tr. Vol. IV, p. 620:6–10.) Flicker testified that Butte County Jail was willing to allow access to a given edition of CJ&A through this electronic monitor system. (Trial Tr. Vol. IV, p. 622:7–15.) The kiosk would contain an icon displayed on the electronic monitor so that inmates could see CJ&A as one of their choices and access the publication on the kiosk screen. (Trial Tr. Vol. IV, p. 622:7–15.)

50. Plaintiff argues that the 33 kiosks are not adequate for allowing inmates to access the publication. However, the Court notes that Plaintiff's distribution method would have

---

[8] During trial, the Court considered argument as to whether admission of evidence concerning the availability of kiosks should be heard in light of the fact that the kiosks have only recently become available and thus were not available from 2004–2007 when Plaintiff was seeking distribution. The Court ruled that this evidence was admissible for two purposes: (1) to support Defendant's assertion that paper was a legitimate safety concern within the facility; and (2) that it is relevant to Plaintiff's request for injunctive relief.

supplied one magazine for every ten inmates. The 33 kiosks allows for one kiosk for each eighteen inmates. This percentage is not ideal but still allows for Plaintiff's publication to be accessed by the inmates. *See Thornburgh v. Abbott*, 490 U.S. 401, 417–18 (1989) (interpreting *Turner* to hold that the exact method of communication requested by a plaintiff is not required to be accommodated, only a sufficient other means of expression).

51. Because an alternative means now exists for electronic distribution of CJ&A, the Court finds that this factor weighs in favor of Defendant for purposes of injunctive relief. However, as to whether available alternatives existed prior to installation of the kiosks, the Court finds that this factor weighs in favor of Plaintiff.

D. Impact of Accommodating the Asserted Right

52. A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally. *Turner*, 482 U.S. at 90. "When accommodation of an asserted right will have a significant "ripple effect" on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Id.*

53. Plaintiff proposes to distribute approximately 58 magazines per month, each magazine totaling approximately 40 pages. Thus, if distributed, Plaintiff's publication would cause approximately an additional 28,000 pages of paper to be distributed throughout the jail.

54. Defendant asserts that distribution would require that

> the Sheriff dedicate his resources to processing and cleaning up unsolicited copies of CJA, and continuously dealing with the problems that unsolicited publications cause in the jail. This course of action will have a significant impact on the jail's ongoing effort to efficiently maintain a secure facility, and will completely undermine the Sheriff's recent efforts to rid the jail of unnecessary paper through the recent investment of electronic kiosks.

(ECF No. 137 at 18.)

55. Bryan Flicker testified that staffing at Butte County jail was an issue and explained that the reason that the jail utilizes a "remote surveillance direct observation" system instead of a direct supervision model in supervising the inmates is due to staffing concerns. (Trial Tr. Vol. IV, p. 616:3–8.)

15

56. Flicker also testified:

> I had discussions with several of my staff members who were concerned that we'd start getting things like we get in our mailbox at home, just campaign ads and all kinds of things sent to current box holder or resident. I wanted to limit – I was afraid if I allowed any of that in, I would get all of it.

(Trial Tr. Vol. IV, p. 594:4–9.)

57. Stephens testified that through his handling of a consent decree, he became

> fluent in what was going on in the jail as far as staffing concerns. I -- as part of the consent decree, myself and the attorney that represents the inmates under the consent decree, we would tour the jail periodically. And I was aware of staff shortages in the jail and also, ah, concerns with the paper being used by inmates.

(Trial Tr. Vol. III, p. 440:13–440:19.)  Stephens testified that he had raised this issue with John Grohs, CJA's general counsel during the time period that Plaintiff approached Defendant about distributing in Butte County jail.  (Trial Tr. Vol. III, p. 440:13–440:19.)

58. Additionally, Stephens testified that Captain Gary Keeler had expressed that one of the reasons behind the jail's mail policy was the impact it would have on the jail staff having to distribute, check for contraband, clean up, and deal with the problems caused by inmates' nefarious use of the materials.  (Trial Tr. Vol. III, pp. 439:22–440:8.)

59. Jones testified that in response to Plaintiff's distribution request, he met with Flicker and discussed "safety and jail security concerns as well as some staffing issues" associated with granting Plaintiff's request.  (Trial Trial IV, 556:2–10.)

60. In sum, Defendant asserts that "the potential opening up [of] the jail to other businesses and individuals seeking to solicit business from inmates would also cause an unintended ripple effect that would be exponentially problematic in the increase in paper abuses and/or orderly maintenance of the jail."   (ECF No. 137 at 19.)  Defendant also argues that "this would invite 'repetitive, piecemeal litigation' by those seeking to advertise in the jail, and would result in the ongoing and unnecessary involvement of the 'federal courts in affairs of prison administration.'"  (ECF No. 137 at 19.)

61. In response, Plaintiff asserts that there is no evidence that allowing distribution of

16

CJ&A would create "a rush of publications to come suddenly into the jail." (ECF No. 135 at 21.) In support, Plaintiff points out that "the only testimony on this point was that over the course of 26 years, CJ&A was only the third publication to seek unsolicited distribution." (ECF No. 135 at 21.)

62. Plaintiff's assertions mischaracterize Defendant's concerns. As it stands, Defendant's policy is content neutral and applies to all unsolicited mail. In contrast, Plaintiff's briefing advocates culling out a niche for certain publications, including its own publication and newspapers. The fact that only three unsolicited publications have recently attempted distribution does not reflect the likelihood that allowing unsolicited mail would not create a ripple effect. *See Morrison v. Hall*, 261 F.3d 896, 903 (9th Cir. 2001) (distinguishing between subscription for-profit bulk rate mail from "unsolicited and non-privileged junk mail" in finding that the former did not create a staffing burden). Therefore, the Court finds that this factor weighs in favor of Defendants.

### E. Exaggerated Response by Prison Officials

63. The fourth factor requires the Court to consider "whether the existence of easy and obvious alternatives indicates that the regulation is an exaggerated response by prison officials." *PNL II*, 397 F.3d at 699. "The absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Turner*, 482 U.S. at 90 (citing *Block v. Rutherford*, 468 U.S. 576, 587 (1984)). However, this factor does not require the Court to employ the "least restrictive alternative test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Id.* at 90–91.

64. Plaintiff asserts that there is an

> obvious and easy alternative to achieve the penological goal of minimizing the use of paper for jail disturbances or in nefarious acts effecting jail security: Actually enforce those rules already in place prohibiting improper use of paper. For those inmates who do use paper for improper purposes, quick meaningful consequences should exist. Currently, violations of these rules are met with only a verbal order to cease the actions. There are no consequences for engaging in such actions. There are only consequences when the inmate fails to obey the actual order or directive to cease the action.

(ECF No. 135 at 22.)

65. In response, Defendant argues that Plaintiff's belief that the rules are not being enforced is contrary to the evidence. (ECF No. 137 at 20.) Defendant further states that "warnings are axiomatic in maintaining order and discipline, and are akin to giving notice of a violation to the inmate and opportunity to correct. Where inmates are first given warnings and then fail to comply, the result remains thousands of violations per annum." (ECF No. 137 at 20.)

66. Defendant also asserts that they have already implemented a reasonable alternative by installing the kiosks and offering to distribute Plaintiff' publication through them. (ECF No. 137 at 20.)

67. This Court agrees. Plaintiff is not an expert on the discipline of inmates or jail security. Moreover, Defendant has recently devised an alternative and implemented it. Thus, this factor weighs in favor of Defendant.

**IV.    CONCLUSION**

In conclusion, the Court finds that the *Turner* factors weigh in favor of Defendant. Plaintiff has not shown that Defendant violated its First Amendment Rights by declining to distribute its unsolicited publication prior to the availability of the kiosks. Thus, the Court finds that Plaintiff has not shown that it is owed declaratory relief or injunctive relief. As such, Plaintiff's claims for declaratory and injunctive relief are DENIED and this case is CLOSED.

IT IS SO ORDERED.

Dated:  May 27, 2015

Troy L. Nunley
United States District Judge